## SIR R. ROPNER & CO., Limited, v. EMMONS COAL MINING CORPORATION et al.

(District Court, E. D. Pennsylvania. November 30, 1926.)

No. 8512.

**1. Shipping ⬅182—Question of liability for demurrage, as well as of amount due, held open in action on bond given to obtain discharge of cargo.**

Where bond for payment of vessel demurrage recited that discharge of cargo was being withheld pending determination of "the actual amount of the claim," and that on giving of bond cargo would "be discharged without prejudice to the rights of the parties at interest," and was conditioned that obligors would "pay * * * the amount of demurrage which shall eventually be agreed upon, either by agreement of the parties or by judicial determination," *held*, question of liability, as well as question of amount due, if any, was open in suit on bond.

**2. Shipping ⬅173—Clause of affreightment contract, providing shipper's liability should terminate when cargo was loaded, held not intended as release from liability already incurred.**

Cesser clause in contract of affreightment, providing "the liability of [the shipper] shall cease and terminate as soon as cargo is loaded,"

*held* to relieve only from further liability, and not a release from liability already incurred.

**3. Shipping ⬦182—Bond held to obligate obligors to pay demurrage due vessel, whether or not liability was that of shipper, principal in bond.**

Bond for payment of vessel demurrage *held* to obligate obligors to pay any demurrage due, irrespective of whether liability was that of shipper, principal in the bond.

**4. Courts ⬦1—Court's function is to do legal, not actual, justice.**

It is not the function of a court to do justice, but to do legal justice.

**5. Shipping ⬦182—Shipper and surety on bond for payment of vessel demurrage held liable thereon as against claim of fraud.**

Where vessel at Rotterdam, Holland, asserting claim for demurrage at loading port, Charleston, S. C., discharged cargo in reliance on promise of bond for payment of demurrage, *held*, shipper in South Carolina and surety on bond given for payment of demurrage were liable thereon, as against claim that execution of bond was fraudulently obtained after cargo had in fact been discharged.

**6. Contracts ⬦143—Parties sui juris must be free to make own contracts, which law must enforce.**

Parties who are sui juris must be free to make their own bargains, which the law must enforce, if of binding obligation in law.

**7. Contracts ⬦94(1)—Law will not aid accomplishment of fraud.**

The law will not lend its aid to the accomplishment of a fraud.

**8. Contracts ⬦100—Fraud is fact, not a legal judgment.**

Fraud in fact is essentially a fact to be found, and not a legal judgment.

**9. Shipping ⬦182—Amount of bond for payment of vessel demurrage held not effectively reduced, absent notice to vessel of surety's consent.**

Where shipper, principal in bond for payment of vessel demurrage, sought reduction of bond which vessel agreed to, provided the surety consented, and where shipper obtained surety's consent, but failed to give notice thereof to vessel, *held*, amount of bond was not effectively reduced.

Action by Sir R. Ropner & Co., Limited, against the Emmons Coal Mining Corporation and another. On trial hearing to the court sitting without a jury. Judgment for plaintiff.

H. Alan Dawson, of Philadelphia, Pa., for plaintiffs.

Acker, Manning & Brown, of Philadelphia, Pa., for defendants.

DICKINSON, J. This is a suit on a bond conditioned to pay vessel demurrage. The case was tried to the court without a jury, the right to such jury trial having been waived. The cause was submitted for decision, which we were then asked to withhold, pending a dispute whether the penal sum of the bond had been reduced. The evidence of this is all to be found in the written correspondence of the parties. The suggestion was made that it be agreed that the letters be incorporated in the trial notes. No agreement has thus far been reached, and we are not willing to further delay a ruling. We must, in consequence, treat this feature of the case as one of a motion to reopen the trial for the purpose of the offer of this correspondence; proof of the authenticity of the letters being waived. The impression is given by the course of the trial that the real defense is that based upon the complaints hereinafter later discussed. A denial of liability under the condition of the bond is, however, interposed. This branch of the defense is based upon the proposition that the bond does not create an obligation to pay anything, but is merely an assurance that whatever obligation the principal obligor had incurred for a demurrage claim would be met.

[1] This takes us to the bond. It recites that the plaintiff had made claim for loading demurrage, that the cargo was being withheld from discharge "pending the determination of the actual amount of the claim," and that it had been agreed that upon the giving of the bond the cargo "shall be discharged without prejudice to the rights of the parties at interest." The pertinent condition of the bond is that the obligors "shall pay * * * the amount of demurrage which shall eventually be agreed upon, either by agreement of the parties or by judicial determination." The plaintiff asserts the bond to leave nothing open except the "amount" or sum of the demurrage incurred. The verbiage of the bond was not chosen to express clearly the distinction thus made between liability for demurrage and the correct calculation of the sum of the claim for demurrage. Inasmuch, however, as the discharge of the cargo was expressly stipulated to be "without prejudice to the rights of the parties," the only meaning the phrase can have is that the right to demurrage is to be determined under the bond, as it would have been determined if no bond had been given.

[2] This takes us to the right of the vessel. The argument for the nonliability of the principal obligor rests wholly upon the cesser clause in the contract of affreightment. As, however, the right to a lien would, as we

view it, argue liability under the bond, we will assume this not to be conceded, and pursue the argument based upon the cesser clause, because, if the obligor is not relieved under this clause, it is clear that it is conceded it is not otherwise relieved, unless it can avail itself of the defenses later made. The clause is that "the liability of [the shipper] shall cease and terminate as soon as cargo is loaded," etc. This, as we view it, has no other meaning than that no further future liability is assumed, nor will be incurred by the shipper. We see in it no warrant for the thought of a release of any liability which had been incurred. We think this to be a reading of the clause which has the support of reason and authority. The Marpesia (C. C. A.) 292 F. 957.

As, except for this clause, the obligor admits liability, we see no need to pursue further the discussion of this branch of the defense, and will not inquire into the rights of the vessel beyond this.

[3] We find the meaning of the bond to be that, if demurrage was the due of the vessel, the obligors would pay it. The defendants seem to concede that demurrage was due, but deny only the liability of the shipper. In the view we take, this point is unimportant.

[4] This takes us to the other branches of the defense. It is easy to find the grievances on which the defendants base their further defenses. It is not so easy to formulate any doctrine of the law, through the application of which relief can be afforded them. Assuming the charge of the overreaching of the shipper to be well founded (as in one feature it may be), some general observations may be helpful. It should always be kept in mind that it is not the function of a court to do justice but to do legal justice. The grounds of the asked-for relief from the obligation of the bond given are two. One goes to the whole bond; the other to a reduction of the penal sum expressed in it.

[5] 1. The defendants were misled into the giving of the bond, by being deceived into the belief that they were receiving a consideration, which was in fact absent.

2. The obligee agreed upon a reduction in the bond from $26,000 to $23,000.

[6, 7] There are two broad principles or policies of the law which here come into play. One is that parties who are sui juris must be free to make their own bargains, which the law must enforce, if of binding obligation in law. The other is that the law will not lend its aid to the accomplishment of a fraud. Both of these doctrines of the law should be given effect. It is seldom, if ever, that a bargain is made without the hope of advantage from it. Each of the parties to it indulges this hope. Sometimes each thinks he has the better of the bargain when made. It not infrequently happens that one or the other is disappointed by the event, and may regret the bargain which he made. It may likewise be that, if he had been more attentive and alert to the consequences, he would not have made it. The ethical judgment would be pronounced by all that each party to a bargain should be fair, open, and candid; but it may develop that one or the other has not been as frank as he might have been, and through this reaps an unfair advantage. The law, however, must be made for its subjects as they are, and not for the ideally perfect, as, like all other human institutions, the law has its imperfections and its limitations.

Out of the frailities of human nature and the shortcomings of the law as an instrument for the prevention or correction of wrongs springs a most fruitful source of litigation over the binding force of contracts. It is an easy thing to take refuge in the ample folds of the broad doctrine that "fraud vitiates all it touches"; but the old difficulty recurs in the attempt to determine what the law deems to be the fraud which works this result. Fraud is one of the many words in our language which defy legal definition. We all instinctively recognize a fraud when we confront it, but each one is controlled in his judgment by his own ethical standards, and there is often here full room for the play of the arts of the casuist. Any legal definition of a fraud is fraught with the danger of doing more harm than good, because it may prove to be an instrument for the use of the unscrupulous and an added trap for the unwary.

[8] Law writers have sought to supply us with tests more or less helpful. One is that the parties must be sui juris, or not under defined disabilities. Another is the presence or absence of the relation of trust and confidence. Again, we have the distinction, which is clear enough, but a difference in practical results in the fraud sense, which is often not very great, between a representation and a warranty. Another aid is supplied by the doctrine of consideration in its absence or failure. Finally, we have the broad doctrine of fraud to which we have referred. Fraud in fact is essentially a fact to be found, not a legal judgment. A lie is said to be the badge of fraud, and so it is, because it, expressed or implied, is always

a companion of fraud. The converse, however, cannot be accepted as a legal truth, for the very practical reason that, if a lie annulled a bargain into the making of which it entered, the binding obligations of contracts would become very spidery ligaments.

This is a long homily, but it carries a helpful lesson. The bond here in suit is admitted, and the facts controlling its condition not in dispute. The defense is based upon the averment, not of failure or absence of consideration, but that the obligors were fraudulently deceived into making the bond, believing a state of facts existed which in truth did not. There is no controversy over the evidentiary facts upon which the defendants rely. They assert that they were overreached by being misled into the making of a bargain, which they would not have made, had they not been deceived. Our task is to determine whether what was done is what the law pronounces to be such a fraud as to annul the contract.

Now for the evidentiary facts. There were three parties initially concerned. One was the vessel (the plaintiff); another, the shipper (the principal defendant); and the third, the consignee of the cargo. The shipment was made at Charleston, S. C., and its destination was Rotterdam, Holland. The vessel had the right to freight, which was payable and was paid by the shipper. It likewise had the right to be paid possible demurrage, which might be incurred either at the port of loading or at that of discharging. The demurrage claim was really not in dispute. There was a difference over the liability for the demurrage. Into this we need not go, further than to get its bearing upon the giving of this bond. We will assume the shipper's position was that it was to pay the freight, but not any demurrage, and that the consignee denied liability for demurrage at the port of loading. When the ship arrived at Rotterdam, she made claim for demurrage incurred at the loading port. The shipper was here; the cargo and consignee, in Rotterdam. The latter notified by cable the defendants of the claim, and that any delay in its adjustment would hold up the discharge of the cargo, and result in a further claim for demurrage at the port of discharge. Out of this came the suggestion, which was later acted upon, that defendants should give a bond, such as that in suit, so that the cargo could be discharged. The selfish interest of the defendants, we assume, was that thereby it received payment for the shipment. The bond was accordingly given.

There was, however, some delay, and the defendants afterwards had reason to believe, and now set up as a defense, that the cargo had actually been discharged before it agreed to give the bond, and that the bond was executed in the unfounded and fraudulently created belief that it was necessary to the discharge of the cargo. The dates are consistent with this theory, inasmuch as the date of the bond is on a day following the sailing of the vessel from Rotterdam.

Arguments have been addressed to us pro and con the proposition that the cargo, although off the vessel, was notwithstanding within her grasp for the purpose of enforcing her claim to demurrage. We will not pause to consider this, because, as we view it, the case can be determined without a finding of the truth respecting this.

We make the dual finding of the evidentiary and ultimate fact that the cargo was put off the vessel in the faith and confidence, and upon the promise, that the bond would be given, and that this acquits the plaintiff of the charge of fraud, no matter by whom the promise was made. The shipper doubtless has reason to at least suspect that this claim is made for the benefit of the consignee, as it may be. There is no evidence, however, that the plaintiff participated in any fraud. The condition of the bond is not to pay any named sum, but, as we have found, whatever was due the vessel for demurrage. There is no controversy, however, over the figures representing the sum due. The conclusion we have reached is that the plaintiff should have judgment for the agreed sum, with costs.

[9] There is still an undetermined controversy. This is over the question of whether the bond is for $26,000, or $23,000. The counsel for the defendants thought, and so stated to us, that the plaintiff had agreed upon a reduction of the bond to the last-named sum. This agreement, however, counsel for plaintiff deny. The attempt was made, as before stated, to adjust this dispute, and finally to at least agree that the evidence—which was all in writing—of the averred agreement should be incorporated in the notes of trial and passed upon by the court.

We have stated that no agreement has thus far been reached, but we now learn that an agreement was reached between counsel and a stipulation filed of record, but of this we were not advised. It is of no practical importance whether the letters, out of the exchange of which the agreement to reduce the

bond is to be found, are treated as in evidence or advanced as grounds of an application to reopen the trial of the cause and to be thus put in evidence. Counsel have now agreed that they be considered to be in evidence, and we will give to them whatever value they can possibly have toward establishing an agreement to reduce the bond. The situation which these letters portray is, we think, easily found.

The demurrage claim had at the time been adjusted at a sum less than the penal sum of the bond. The defendants were paying a premium to the surety company. Counsel for plaintiff were willing that the bond should be reduced, to save the payment of this useless premium; but, as there was a surety on the bond, they, of course, stipulated that the surety should agree to the change. This was as far as they went. The surety never notified counsel for plaintiff that they had consented, and so far as counsel for plaintiff were informed they never had so consented. The reduction was in consequence not made, and there was such a long delay in having the sum of the demurrage determined that the total sum, with interest, now exceeds $23,000. Counsel for plaintiff, under these circumstances, naturally feel that they should not now reduce the sum of the bond. It appears now that the surety had in fact consented to its principal, but had failed to advise plaintiff or its counsel of that consent, and it further appears that counsel for defendant were under the belief that the surety's consent without notice was sufficient. This relieves us of any inquiry into the form of agreement which will relieve an obligation under seal. Our finding is that the bond in suit is in the penal sum of $26,000, unreduced.

A formal judgment in accordance with this opinion may be entered, the court retaining jurisdiction of the cause for this purpose.